IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CHEN-LI SUNG, M.D., | ) | CIV. NO. 11-00103 JMS/KSC |
| | ) | |
| Plaintiff, | ) | ORDER DENYING PLAINTIFF'S |
| | ) | MOTION FOR PRELIMINARY |
| vs. | ) | INJUNCTION |
| | ) | |
| KEITH W. GALLAGHER, in his | ) | |
| official capacity as Commander of | ) | |
| Tripler Army Medical Center; et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

Plaintiff U.S. Army Major Chen-Li Sung, M.D. ("Plaintiff" or

"Sung"), was terminated from the Tripler Army Medical Center ("TAMC")

General Surgery Residency training program on February 9, 2011.[1]  Sung moves

for a preliminary injunction "confirming the ineffectuality of [his] termination

from the surgical Residency Program, and preventing Defendants from making any

adverse reports about [him] to the National Practitioner[] Data Bank or other

_____

[1] Sung was a Captain when he was terminated from the surgical residency program.  He has since been promoted to Major.  *See* Doc. No. 23-15.

bodies[.]" Doc. No. 17-2, at 20.[2]  Sung argues he was terminated without due process of law, and that the dismissal was a pretext for unlawful disability discrimination.  For the reasons set forth, the Motion for Preliminary Injunction is DENIED.

## II. <u>BACKGROUND</u>

### A.    Factual Background

Sung graduated from Mount Sinai School of Medicine in New York City with a Doctor of Medicine degree on April 29, 1998.  Doc. No. 23-3.  He began a surgical residency at Saint Barnabas Medical Center in Livingston, New Jersey, on July 1, 1998.  Doc. No. 23-4.  He withdrew from his surgical residency during his second year, and worked in the financial field on Wall Street for the next five years.  Doc. No. 17-20, at 1; Doc. No. 23-5, at 4; Doc. No. 23-11, at 92.

On March 4, 2005, Sung was appointed as a Captain, U.S. Army, in the U.S. Army Medical Department ("AMEDD").  Doc. No. 23-2; Doc. No. 23-5, at 5-6.  He completed the AMEDD Officer Basic course on May 13, 2005, and was assigned to TAMC to resume a surgical residency on May 14, 2005.  Doc. No. 23-5, at 6-8.  While at TAMC, he received high ratings on his officer evaluation

---

[2]  The court cites directly to document numbers in the electronic case file ("ECF"), and to the corresponding pages of that ECF entry.  "Doc. No. 17-2, at 20" refers to page 20 of ECF document 17-2.

reports from 2005 to 2009. Doc. No. 23-6, at 4-11. He began his last year of surgical residency (his chief resident year) on May 14, 2009. *Id.* at 2.

Sung had difficulties in his chief resident year. *Id.* at 3; Doc. No. 23-7, at 2. In July and August 2009, the general surgery program director, Dr. Ronald Gagliano, counseled Plaintiff. Dr. Gagliano stated that Sung "began avoiding work due to stress." Doc. No. 23-5, at 3. In September 2009, Sung suffered a recurrence of "major depressive disorder," Doc. No. 9 ¶ 11, and was on medical leave through November 2009. Doc. No. 23-7, at 1. He returned to full duty on December 1, 2009, but was at a "service remediation" level for sixty days. *Id.* at 2. The "causes of remediation" were listed as by Dr. Gagliano as: "work avoidance/hard case avoidance," "poor patient care," "not carrying out the administrative and supervisory duties of a [fifth year resident]," "relying on other residents to do his work and failure of appropriate supervision," and "interpersonal skills and communication, *i.e.*, reporting on other residents' patient assessments as his own." *Id.* at 2-3. Sung's First Amended Complaint asserts that the late-2009 recurrence of his depression was "attributable to conflicts between [Sung] and two of his superiors in the Department of Surgery who falsely accused [him] of being untruthful[.]" Doc. No. 9 ¶ 12.

On February 2, 2010, Dr. Gagliano recommended to the TAMC

Graduate Medical Education Committee ("GMEC") that Sung be put on probation. Doc. 23-8, at 3-10. The recommendation indicated that Sung had "failed [his] required rotation while on service level remediation for January 2010." *Id.* at 3. It documented, or alleged, certain incidents of substandard performance such as where Sung apparently mis-diagnosed a child who had appendicitis. *Id.* at 5. (Sung later disputed the details of these incidents. Doc. No. 23-10, at 4-11.) Sung accepted the probation plan on February 5, 2010. Doc. No. 23-8, at 1.

On March 3, 2010, Dr. Gagliano relieved Sung of his clinical duties, and recommended he be terminated from the surgical residency program. Doc. No. 23-9. Sung refused the proposed dismissal, and provided a lengthy written response disputing many of Dr. Gagliano's details and explaining that he was being treated unfairly. Doc. No. 23-10. Sung elected to appear before the GMEC with counsel. *Id.* at 12. A dismissal hearing was held before the GMEC on March 29, 2010. On April 5, 2010, the GMEC denied Dr. Gagliano's recommendation to terminate Sung. Doc. No. 23-11, at 115. Sung's First Amended Complaint states that the GMEC found Sung "had been compelled to work in a hostile environment." Doc. No. 9 ¶ 12.[3]

---

[3] Neither the transcript of the March 29, 2010 GMEC proceedings, nor any specific findings from that proceeding, are part of the record. Dr. Gagliano's successor (Dr. Dwight Kellicut), however, told the GMEC on December 16, 2010:

(continued...)

Certain conditions were placed on Sung being able to remain in residency training, including allowing Sung to try to transfer to another training program away from TAMC. Doc. No. 23-11, at 115. If such a program was not found, Sung was to resume his residency at TAMC and his probation would be continued. *Id.* By the end of April 2010, Sung was not able to find a residency program outside TAMC, so he returned to TAMC where he was placed on probation for two months. *Id.* at 116.

From June to August 2010 Sung performed "adequately" and was rated "satisfactory." *Id.* at 125-35. On September 2, 2010, however, Sung was removed from providing patient care "for medical reasons." *Id.* at 137. A new acting program director, Dr. Dwight Kellicut, wrote that

> [Sung's] performance over the last five weeks has degraded substantially, *i.e.*, oversleeping for rounds, sleeping 20+ hours at a time, missing meals due to no appetite. Residents report seeing him sleeping excessively in the call room which culminated in his absence from academic conference yesterday and his failure to complete required Morbidity and Mortality

---

[3](...continued)
[d]uring [Sung's] initial dismissal hearing, there was a perception that perhaps the general surgery program was in fact toxic towards Capt. Sung; that we had unfairly singled him out. . . . As I reviewed that whole process and looked at everything, perhaps in my mind I felt that [Capt.] Sung in certain situation had been targeted. But . . . I wasn't there.

Doc. No. 23-11, at 11.

Reports in a timely fashion.

*Id.* Dr. Kellicut acknowledged Sung's illness:

> I have a real and honest concern for this resident's well
> being and his ability to care for patients safely. . . . CPT
> Sung's difficulties, in my opinion, are due to severe
> depression and emotional stress. . . . CPT Sung is
> technically able to operate and he is in good academic
> standing. However, being a surgeon and making life and
> death decisions require someone who is 100% at all
> times, not someone who is 60% at best [as Sung has
> estimated] . . . . I recommended he see his psychiatrist
> immediately.

*Id.* at 138. On September 8, 2010, Sung was suspended from patient care, pending

a mental health evaluation. *Id.* at 139.

On November 24, 2010, Sung was notified that the program director

was recommending he be terminated from the TAMC General Surgery Residency

training program, based on his "regression after removal from probation."

According to the notification, "there was consensus [with the program faculty] that

you remain deficient in your performance despite remediation and probation." *Id.*

at 140. The notification referenced the prior September 2, 2010 and September 8,

2010 suspension memoranda. On December 1, 2010, Dr. Kellicut recommended

that Sung's residency training be terminated. *Id.* at 142.

Sung appeared before the GMEC to challenge his termination. *Id.* A

hearing before the GMEC was held on December 16, 2010, where Sung appeared

with counsel present.  Doc. No. 23-11.  Under the applicable rules, however, counsel "may not ask questions or make arguments or address committee members during the proceedings, but the trainee may consult the attorney."  Doc. No. 23-13, at 19.  (The details of the hearing process are explained in the discussion section below where the court analyzes whether the hearing provided Sung with adequate due process.)

On December 20, 2010, the GMEC agreed with Dr. Kellicut's recommendation and terminated Sung's surgical residency.  Doc. No. 17-19.  An appeal, through counsel, was filed with the TAMC Commander, Brig. Gen. Keith W. Gallagher.  Doc. No. 17-20.  The appeal was denied on February 9, 2011, and Sung's termination became final.  Doc. No. 17-21.

## B.    Procedural Background

Plaintiff filed this action on February 16, 2011.  Doc. No. 1.  He named as Defendants Keith W. Gallagher, in his capacity as TAMC Commander; Holly Olson, in her capacities as Director of Medical Education and Chairperson of the TAMC GMEC; and the GMEC itself.  The court refers here to the Defendants collectively as "the Army."  Plaintiff filed a First Amended Complaint on April 26, 2011.  Doc. No. 9.  Plaintiff's Motion for Preliminary Injunction was filed on May 13, 2011.  Doc. No. 17.  The Army filed an Opposition, combined with a Counter-

motion to Dismiss, on May 27, 2011.[4]  Doc. No. 23.  Plaintiff's Reply and

Opposition to Motion to Dismiss was filed on June 3, 2011.  Doc. No. 26.  The

Army filed a Reply on June 13, 2011.  Doc. No. 29.  A hearing was held on June

20, 2011.

## III.  <u>STANDARD OF REVIEW</u>

"A preliminary injunction is an extraordinary and drastic remedy

[that] is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)

(citation and quotation signals omitted).  In *Winter v. Natural Resources Defense*

*Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365 (2008), the Supreme Court explained that

"[a] plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest."  *Id.* at ___, 129 S. Ct. at 374.  So long as all

four parts of the *Winter* test are applied, "a preliminary injunction [may] issue

where the likelihood of success is such that 'serious questions going to the merits

were raised and the balance of hardships tips sharply in [plaintiff's] favor.'"

---

[4]  As the court stated at the hearing, the Army's Counter-motion to Dismiss is improper
to the extent it relies on evidence for resolving disputed issues unrelated to subject matter
jurisdiction -- issues which should more properly be addressed by a motion for summary
judgment.  For administrative purposes, and without objection from the parties, the Counter-
motion is deemed withdrawn without prejudice.

*Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting

*Clear Channel Outdoor, Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003)).

"In other words, 'serious questions going to the merits' and a hardship balance that

tips sharply toward the plaintiff can support issuance of an injunction, assuming

the other two elements of the *Winter* test are also met." *Id.* at 1132.

    A heightened standard of irreparable harm applies when reviewing

military decisions involving internal or personnel matters. *See Hartikka v. United*

*States*, 754 F.2d 1516, 1518 (9th Cir. 1985) (indicating that a moving party seeking

injunctive relief against the armed services must make a stronger showing of

irreparable harm than is required under an ordinary situation) (citing *Sampson v.*

*Murray*, 415 U.S. 61, 84, 91-92 n.68 (1974));[5] *see also Guerra v. Scruggs*, 942

F.2d 270, 274 (4th Cir. 1991) ("*Sampson's* higher requirement of irreparable injury

should be applied in the military context given the federal courts' traditional

---

[5] Plaintiff argues *Hartikka* is no longer valid after *Winter* because *Hartikka* applied a "sliding scale" standard for injunctive relief. True, *Hartikka* repeated part of the standard that *Winter* found improper. *See* 754 F.2d at 1518 (stating that a court can grant an injunction upon a showing of "a combination of probable success on the merits and the *possibility* of irreparable injury") (emphasis added). But the essential premise of Plaintiff's argument is incorrect -- the Ninth Circuit subsequently confirmed that "the 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*[.]" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011). More importantly, *Winter* itself reiterated that, in cases involving "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force," courts "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, ___, 129 S. Ct. 365, 377 (2008) (citations omitted).

reluctance to interfere with military matters.").

## IV. <u>DISCUSSION</u>

Sung argues that he has met all the requirements under *Winter* for entry of a preliminary injunction. The court proceeds to analyze whether (1) Sung is likely succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.

## A.      Likelihood of Success on the Merits

Sung contends he is likely to succeed on the merits because he was deprived of due process when his residency was terminated, where the termination was a pretext for disability discrimination -- that is, was based not on his academic competency, but on his major depressive disorder.

### 1.      *Due Process Principles in a Medical Residency Termination*

To evaluate the strength of Sung's due process claim, the court applies *Stretten v. Wadsworth Veterans Affairs Hospital*, 537 F.2d 361 (9th Cir. 1976) and *Ong v. Tovey*, 552 F.2d 305 (9th Cir. 1977), both of which analyzed due process challenges by medical residents terminated from federal residency programs. The court ordinarily first determines whether a protected property or liberty interest is at stake, and if so, then addresses whether, in light of the competing interests of the

individual and the government, the procedures afforded plaintiff satisfied due process. *Stretten*, 537 F.2d at 365; *Ong*, 552 F.2d at 307.

Here, however, the Army does not contest whether Sung has a property interest in continuing his residency. Rather, it assumes Sung has a constitutionally-protected interest, but argues that the process provided in his GMEC proceeding was more than sufficient. *Cf. Stretten*, 537 F.2d at 367 (holding that "Dr. Stretten's claim to his residency is a property interest deserving of appropriate due process before it is removed," relying on particular language in his appointment form). The court thus focuses on the process that was provided.

"[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Ong*, 552 F.2d at 307 (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Mathews*, 424 U.S. at 334). *Mathews* set forth three factors to consider:

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of (a property) interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or

substitute procedural requirement would entail.

*Id.*

Considering those factors in a medical residency context, *Stretten* held that "due process does not require a full adversary hearing either before or after termination [of a medical residency]." 537 F.2d at 369. The Ninth Circuit reasoned that "[t]he ultimate decision-maker must have wide discretion in considering the evidence against a resident[,] includ[ing] the power to attach great value to the considered opinions of the resident's colleagues." *Id.* *Stretten* set forth the following standards, well short of a full adversary hearing:

> The resident's interest is important enough that he
> should have notice of his deficiencies, should
> have an opportunity to examine the evidence
> against him, and should be allowed to present his
> side of the story to the decision-maker. These
> procedures will insure that all relevant data are
> before the decision-maker and will allow the
> terminated resident and any reviewing court to
> judge whether the decision-maker acted in bad
> faith or arbitrarily and capriciously.

*Id.*

Applying *Stretten*, *Ong* addressed a situation where a doctor was suspended from a surgical residency program without formal notification (although his operating privileges had previously been limited) and without a prior formal adversarial hearing. 552 F.2d at 305. After termination, the resident and his

12

attorney met with the decision-making doctors in a "question and answer" session that allowed "the opportunity to question the other doctors and the decision-makers about how they arrived at their decision to terminate [the resident] from his residency program." *Id.* at 308. That post-termination process "satisfied the *Stretten* standard that the decision-maker have enough data before him that his decision to terminate is not arbitrary, capricious or unfair." *Id.* *Ong* held that:

> the government's interest in protecting patients from medical incompetence outweighs the physician's private interest in greater income and higher position. In cases such as this where doctors work very closely together and the decision to terminate a resident is made based upon their personal observation, less rigid procedures are necessary to prevent an "erroneous deprivation" of the resident's property interest.

*Id.* at 307. Although the procedures used were not "the best possible," *Ong* determined "they satisfied the basic requirements of constitutional due process." *Id.*

### 2. Application to Plaintiff's Termination

Applying the preceding due process principles, it is unlikely Sung will succeed on his due process challenge to his termination of residency. Sung's termination was conducted pursuant to the United States Army Medical Command's "Policy on Due Process for Participants in Military Graduate Medical

Education Programs" (the "Due Process Policy"). *See* Doc No. 23-13.

The Due Process Policy -- adopted by TAMC in essential form and followed in Sung's termination proceeding -- provides that a program director can recommend termination of a resident, but termination itself must be approved by at least a two-thirds vote by secret ballot of a GMEC. *Id.* at 12. It provides a resident with extensive rights prior to termination, including (1) the right to hear the reasons for action as put forth by the program director, (2) the right to review all documents before the committee, (3) the right to legal counsel (who may not ask questions or make arguments during the proceedings, but who may advise the resident), (4) the right to respond both orally and in writing to the program director's statements, (5) the right to present testimony of witnesses, (6) the right to submit statements or documentation, or other information, to show why termination should not occur, and (7) the right to appeal the decision. *Id.* at 16; *see also* Doc. No. 23-14, at 24-25 (setting forth same rights in the TAMC Handbook for Residents).

Under the Due Process Policy, a recommendation for dismissal must be based on: (1) failure to satisfactorily progress toward correction of deficiencies while on probation; (2) regression or failure to satisfactorily progress after removal from probation; or (3) any act of gross negligence or willful misconduct. Doc. No.

23-14, at 17.  The program director must notify the resident in writing that dismissal is being considered, and the notification must include "specific reasons" for the proposed dismissal.  *Id.*  A resident is then given a minimum of five working days to submit a written response.  *Id.*  A hearing may be convened, which must be at least ten working days after notification to the resident.  *Id.* at 17-18.  The GMEC itself decides whether to terminate a resident -- the program director does not vote.  *Id.* at 18.  Deliberations and voting are done in closed session, although the decision is documented with confidential written records.  *Id.*  The resident may file an appeal of a dismissal to the TAMC Commander.  *Id.* at 19.  The TAMC's decision is final, and there is no right to further appeal.  *Id.*

Facially, the Due Process Policy easily complies with the minimum standards set forth in *Stretten*.  Under the Due Process Policy, a resident is (1) given ample and timely notice of alleged deficiencies, (2) has an opportunity to examine the evidence against him, and (3) is allowed to "present his side of the story" to the GMEC.  *Stretten*, 532 F.2d at 369.  The procedures "insure[] that all relevant data are before the decision-maker" and are sufficient to "allow the terminated resident and any reviewing court to judge whether the decision-maker acted in bad faith or arbitrarily and capriciously."  *Id.*  And the procedures well exceed the process provided in *Ong*.  *See* 552 F.2d at 307.

Sung's termination process complied in all essential respects with the Due Process Policy. He was provided with a notice of proposed termination and the reasons supporting termination (the September 2, 2010 and November 22, 2010 memoranda from program director Dr. Kellicut). *See* Doc. No. 23-11, at 137-141. The notice indicated proposed termination for "regression or failure to satisfactorily progress after removal from probation." *Id.* at 140. The memoranda outlined in detail the reasons for Sung's suspension from duties -- oversleeping for rounds, sleeping twenty hours at a time, sleeping excessively in the call room, absence from an academic conference, failure to complete required "morbidity and mortality reports." *Id.* at 137. According to Dr. Kellicut, Sung admitted his performance on a daily basis was only "adequate sixty-percent of the time." *Id.*

Further, at the December 16, 2010 termination hearing -- as well as before the hearing -- Sung had ample opportunity to examine the evidence against him. He met with Dr. Kellicut before the hearing. He asked pertinent questions at the hearing (especially regarding the effect of his disability on his performance). He examined Dr. Kellicut. Doc. No. 23-11, at 22-32. He presented three witnesses of his own -- his examining and treating psychiatrists, Drs. Morris and Levy, and an "ombudsman," Dr. Zagorski. *Id.* at 44, 57, 80. Sung testified on his own behalf, presenting "his side of the story" passionately. *Id.* at 91-95. Many of the

nineteen members of the GMEC asked pertinent questions regarding Sung's performance and competency, and how his depressive disorder might affect his performance, both during training and as a surgeon. *See, e.g.*, *id.* at 36, 46-49, 54-55, 59, 63, 67, 76, 80, 87, 88, 90.

After the GMEC issued its termination decision, Sung's counsel appealed to Brig. Gen. Gallagher on December 28, 2010. Doc. No. 17-20. Brig. Gen. Gallagher reviewed the applicable policies and regulations, Sung's records, the transcript of the GMEC hearing, and Sung's written appeal. He also interviewed staff physicians and administrators, and a psychiatrist who had evaluated Sung. On February 9, 2011, he upheld the GMEC's decision and Sung's termination became final. *Id.*[6]

It follows without question that Sung was given sufficient due process in the termination proceedings before the GMEC. His proceedings easily satisfied due process when measured against the requirements set forth in *Stretten* and *Ong*.

---

[6] The First Amended Complaint alleges that Brig. Gen. Gallagher's decision was late, as the Due Process Policy states that "written notification of the decision regarding an appeal must be provided to the trainee within *two working days* following receipt of the appeal." Doc. No. 23-14, at 19 (emphasis added). It is unclear whether this means the TAMC Commander must notify a resident within two days that the Commander has decided the appeal, or that the Commander must actually decide the appeal within two days. In any event, even if Brig. Gen. Gallagher's decision was late under the latter interpretation, there is no showing that not deciding the appeal within two days was prejudicial to Sung or that his due process rights were otherwise violated. Any violation of this seemingly unreasonable deadline would work only to an appellant's benefit.

Indeed, Sung cannot seriously argue that the Due Process Policy was not followed. Rather, he argues that he was deprived of due process "on the unique facts of this case" (as his counsel stated at oral argument) because his dismissal was a pretext for disability discrimination. He contends that he was dismissed because of his disability (a depressive disorder), and not because of academic or surgical failings.

In this regard, Sung claims an Army Medical Evaluation Board ("MEB") -- rather than the GMEC -- was the appropriate body to make a medical determination. Sung believes the GMEC was "ill-equipped" to make a termination decision based on a medical condition. If an MEB had determined that Sung did not meet retention standards, it could have referred him to a Physical Evaluation Board, where additional due process protections would apply. *See* Doc. No. 17-9, at 4. By convening a GMEC -- so Sung's argument goes -- the Army deprived him of the opportunity for his counsel to actively participate in the process.[7] Sung also contends General Gallagher should have consulted with officials familiar with his ongoing participation in the Impaired Healthcare Personnel Program ("IHCPP").

_____

[7] Sung argues that questions by his counsel during the GMEC hearing could have clarified that his termination was based on his disability and not on his performance, and thus amounted to a due process violation. But the record reflects that this issue (whether termination was recommended because of disability, or performance) was a central concern during the proceedings. The proceedings gave ample opportunity for exploration of Sung's ability to perform as a surgeon, both while his depressive disease was "in remission" and while it was episodic. *See, e.g.*, Doc. No. 23-11, at 40-43, 50-54. The Due Process Policy provided Sung sufficient opportunity to present his position on this specific issue.

The Army points out, however, that neither an MEB nor the IHCPP is qualified to assess academic matters such as whether a physician should be terminated from a medical residency program.  Rather, an MEB is used to determine whether a soldier is "fit for duty," and, if not, whether he or she should be dismissed from active duty.  Doc. No. 23-19, at 4.  Likewise the IHCPP's function is "to provide support, assistance, and rehabilitation to those healthcare personnel who suffer from a condition that negatively influences, or has the potential to negatively influence, optimal performance."  Doc. No. 17-6, at 1.  These bodies have no defined role in medical residency decisions.  It is therefore not likely that Sung was deprived of due process even if the Army could have convened an MEB to address Sung's fitness, and even if it could have gained further insight by considering the IHCPP.

### 3.    *Pretext for Disability Discrimination*

Sung next argues that his termination was unlawful disability discrimination -- claiming the Army terminated him from TAMC's surgical residency program because he suffered from a major depressive disease, not because he could not perform as a surgeon -- and even if such a consideration by the GMEC did not deny him due process, it is otherwise actionable such that the court should enjoin the Army from acting on the termination.  As with a due

process challenge, however, Sung is unlikely to succeed on this aspect of his claim.

It bears emphasizing that this proceeding is not a direct appeal from Brig. Gen. Gallagher's decision upholding the GMEC's termination of Sung's residency. There is no provision for direct judicial review of such a decision. Rather, this is an action seeking a declaration that the termination violated Sung's constitutional rights -- rights to procedural or substantive due process. *See* Doc. No. 9 ¶ 51. The court's role, therefore, is not to determine whether Sung should have been terminated from the residency program, or even to determine whether the termination was based on Sung's disability. The court is limited to reviewing whether the process was proper, and whether the decision was arbitrary and capricious. *See, e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 222 (1985) (applying substantive due process).

The court's review is also constrained because it examines a decision that involves both (1) a military determination regarding an active-duty officer's training, and (2) a professional school's judgment regarding qualifications to be a general surgeon and not simply a physician. *See, e.g.*, *Winter*, 129 S. Ct. at 377 (reasoning that courts "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest" in cases involving "complex, subtle, and professional decisions as to the

composition, training, equipping, and control of a military force") (citations

omitted); *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 817 (9th Cir. 1999)

("[A]n educational institution's academic decisions are entitled to deference"

because "courts generally are 'ill-equipped,' as compared with experienced

educators, to determine whether a student meets a university's 'reasonable

standards for academic and professional achievement.'") (quoting *Zukle v. Regents

of the Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999)).

> a.    *Federal Disability Discrimination Statutes Do Not Apply*

Sung asks this court to examine and apply the principles in *Zukle*, in

which the Ninth Circuit upheld the termination of a medical student, but did so

where the University of California had provided "reasonable accommodations" to

the student as required by the Americans with Disabilities Act, 42 U.S.C. § 12132

(the "ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. *Zukle*,

166 F.3d at 1048-50. *Zukle* cautioned that, in enforcing the ADA and

Rehabilitation Act, courts "must be careful not to allow academic decisions to

disguise truly discriminatory requirements." *Id.* at 1048. Sung argues that he was

terminated ostensibly for "academic" reasons but where -- in contrast to Zukle --

no accommodations for his disability were provided.

> *Zukle* is unpersuasive. First, *Zukle's* reasoning stems entirely from

requirements of the ADA and the Rehabilitation Act. Its discussion of "reasonable accommodations," and whether particular requested accommodations would fundamentally alter the medical school curriculum, is based on those particular federal laws. But neither the ADA nor the Rehabilitation Act applies to Sung as a uniformed member of the armed forces. *See*, *e.g.*, *Coffman v. Michigan*, 120 F.3d 57, 59 (6th Cir. 1997) ("[C]laims under the Rehabilitation Act [and the ADA] may not be asserted by uniformed members of the armed forces."); *Doe v. Garrett*, 903 F.2d 1455, 1462 (11th Cir. 1990) (holding that uniformed military personnel have "no remedy under the Rehabilitation Act"); *Smith v. Christian*, 763 F.2d 1322, 1325 (11th Cir. 1985) (reasoning that the Rehabilitation Act did not override the Navy's countervailing statutory authority to prescribe physical qualifications for sailors); *see also* 42 U.S.C. § 12111(5)(B)(i) (providing under the ADA that "the term 'employer' does not include the United States"); and 29 C.F.R. § 1614.103(d)(1) ("[The Rehabilitation Act] does not apply to . . . Uniformed members of the military departments[.]").

Thus, because the Rehabilitation Act does not apply, it cannot form the basis of a legal duty by the Army to provide reasonable accommodations to an active duty military resident before considering whether to terminate his or her residency. Aside from the Rehabilitation Act, Sung points to several sets of

regulations that he claims provide a basis for this court to find a duty to accommodate his disability.  *See* Doc. No. 17-11 (32 C.F.R. § 56.4, providing in part, "It is DoD policy that no qualified handicapped person shall be subjected to discrimination on the basis of handicap under any program of activity that receives or benefits from Federal financial assistance[.]"); Doc. No. 17-12 (32 C.F.R. § 56.8, which sets forth "Guidelines for determining discriminatory practices"); Doc. No. 17-13 (Army Policy on Harassment); Doc. No. 17-14 (Department of Defense ("DOD") Directive 1020.1, Nondiscrimination on the Basis of Handicap in Programs and Activities); and Doc. No. 17-15 (Army Regulation 600-7).

These regulations do not support Sung's position.  Title 32 C.F.R. Part 56 contains the regulations implementing the Rehabilitation Act.  *See* 32 C.F.R. § 56.1 ("This part implements section 504 of Public Law 93-112, "Rehabilitation Act of 1973[.]").  Similarly, DOD Directive 1020.1 specifically refers to the Rehabilitation Act in its prefatory paragraph.  *See* Doc. No. 17-14, at 1.  And, in turn, Army Regulation 600-7 "implements DOD Directive 1020.1" and contains the same language of the Rehabilitation Act.  *See* Doc. No. 17-15 at 1, 16.  If the Rehabilitation Act itself does not apply to active duty military members, its regulations also do not apply.

Moreover, the cited regulations do not create a private right of action

for a violation. *See, e.g.*, *Hanson v. Wyatt*, 552 F.3d 1148, 1157 (10th Cir. 2008) ("To the extent that Col. Hanson may be suggesting that the alleged violation of [the military regulation] in itself gives him a cause of action, this theory fails [because] [t]he Supreme Court . . . will rarely recognize an implied private cause of action arising from a mere regulation.") (citing *Alexander v. Sandoval*, 532 U.S. 275 (2001)); *see also Idahosa v. Blagojevich*, 2006 WL 6322685, at *6 (C.D. Ill. Mar. 9, 2006) ("Regulations generally prohibiting discrimination do not transform Plaintiff's discrimination claims [against the military] into justiciable matters.").

   *b.*  *The GMEC Considered Non-Discriminatory Factors*

    Even applying *Zukle's* general concept that "the court must be careful not to allow academic decisions to disguise truly discriminatory requirements," 166 F.3d at 1048, the record provides ample evidence that the GMEC considered Sung's performance -- a non-discriminatory factor -- in its decision. Dr. Kellicut emphasized repeatedly that Sung's performance was "tumultuous" and "not predictable" on a daily basis. Doc. No. 23-11, at 10, 19, 21, 25, 27, 30, 32. That viewpoint was shared by others. *Id.* at 25-26 ("I have the backing of every attending -- that we do not feel that surgery is the right fit for you based on performance"), and 88 ("our staff feels that it was with unanimity that [Sung should not be allowed to graduate and be a fully functional surgeon on his own]").

Evidence indicates performance problems even when Sung's depression was not episodic. *See, e.g.*, *id*. at 109.

As to pretext, the court recognizes that is difficult to separate Sung's disability from his performance -- a reality that Dr. Kellicut and others repeatedly acknowledged. *See, e.g.*, *id.* at 27, 30, 31, 75-76, 89-90, 103. Sung admitted the difficulty. *See id.* at 91 ("There's no clear way to me to separate my diagnosis and its worsening from the decline in my performance."). Whether that difficulty of separating Sung' disease from his performance could amount to unlawful disability discrimination is not a question before the court. But what is clear is that the GMEC considered and balanced Sung's disease with the concomitant duty of the Army to produce qualified general surgeons. Dr. Kellicut testified to this several times. And his words before the GMEC bear repeating:

> [W]e also have an obligation, I think, to society . . . [to] train [surgical residents] with the understanding that once they leave here, they go forward, able to perform at a given level wherever the Army might send them . . . it could be on the battle field of Iraq or Afghanistan. . . . [O]nce they've completed their training, regardless of where they're sent, they have to be prepared. And to prepare them for their role as a surgeon in the United States Army, we have specific guidelines . . . we have standards.

*Id.* at 9-10. He reiterated his duty:

> [I]t is the obligation of a program director . . . to ensure

that the resident demonstrates sufficient competence to enter practice without direct supervision. . . . My obligation to the soldiers who wear the uniform, to his future patients . . . [i]s that the individual [be] competent and dependable to go out and practice surgery independently[.]

. . . . [F]rom a surgical standpoint [we] take care of very sick people who have very small margins for error.

*Id.* at 18-19. Based on his observations, Dr. Kellicut told the GMEC:

. . . . [A]s I looked back at [Sung's] performance, patterns of performance, consistency of performance, I came to the decision that for me personally, and I took this to the surgery staff, I do not feel that CPT Sung has demonstrated through his chief resident year on numerous occasions a pattern of consistency.
. . . .

I personally am very fearful that if CPT Sung is allowed to continue to ultimately go out and practice surgery, that this pattern or performance will repeat itself and someone will get hurt.

Again, the obligation to society, the obligation to the men and women in uniform is something that I do not take lightly.

*Id.* at 21-22. Dr. Zagorski, a witness called by Sung supported this rationale by

testifying:

. . . . And as a general surgeon, . . . you're the man. . . . And when somebody's bleeding or blown up, it's not the intensive care nurse putting them back together, it's the general surgeon. And you either do it or you don't. And oftentimes, you are doing things that you've never done before.

*Id.* at 85. He told Sung at the hearing:

26

> . . . . I don't think you have . . . the competency to be a
> general surgeon.  And you are able to perform as a
> resident, but there are grave -- there are concerns that you
> will not be able to be competent as an . . . independent
> surgeon.

*Id.* at 83.  Dr. Zagorski was asked whether Sung possesses competency for

independent practice of surgery, and responded "[n]ot even to his own -- even by

his own admission, not a hundred percent of the time."  *Id.* at 87.  He repeated:

> I do not feel Dr. Sung is not competent to be a physician.
> I just don't think he possesses the competency to be a
> surgeon . . . .  I don't believe he possesses some of the
> intangibles in order to allow him to fully be competent in
> every situation.  And competency requires bringing a
> minimum level of skill to every single situation.

*Id.* at 89.

Given the preceding testimony, and from a complete review of the

current record, the GMEC's decision was not arbitrary and capricious.  The court's

review is limited to whether due process was provided, and -- even considering that

the Army has some policy to refrain from disability discrimination -- Sung has

little likelihood of success on a substantive due process claim based on a theory

that his termination was a pretext for unlawful disability discrimination.

### 4.  *Justiciability of a Claim for Disability Discrimination*

Even if Sung could directly raise a discrimination challenge before

this court (that is, if he had a cognizable cause of action that would allow this court

to address whether his dismissal was pretext for unlawful disability

discrimination), the record is unclear whether such a claim would be reviewable in

the current action.

       "Under the [*Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971),] test as

modified by [the Ninth] Circuit, a person challenging a military decision generally

must satisfy two threshold elements before a court can determine whether review

of his claims is appropriate." *Wenger v. Monroe*, 282 F.3d 1068, 1072 (9th Cir.

2002). "An internal military decision is unreviewable unless the plaintiff alleges

(a) a violation of [a recognized constitutional right], a federal statute, or military

regulations; and (b) exhaustion of available intraservice remedies." *Id.* (quoting

*Khalsa v. Weinberger*, 779 F.2d 1393, 1398 (9th Cir. 1985)).

       Sung has met the first part of the test (allegation of a recognized

constitutional right), but it is not established that he has either exhausted "available

intraservice remedies" or that no such remedies are available. In an analogous

context, caselaw indicates that, although an active duty service member has no

statutory remedies under Title VII for discrimination, the service member

nevertheless has administrative remedies. *See Hodge v. Dalton*, 107 F.3d 705, 712

n.5 (9th Cir. 1997) (citing *Chappell v. Wallace*, 462 U.S. 296, 303-05 (1983)); *see

also Gonzalez v. Dep't of Army*, 718 F.2d 926, 929 n.2 (1983). It appears Sung

recognizes an exhaustion requirement -- he filed a disability discrimination complaint against TAMC on April 6, 2011, but asserts in his First Amended Complaint that he has not received a response and that "the administrative process appears to allow for an indefinite period of appeals." Doc. No. 9 ¶ 41; Doc. No. 17-22. Thus, on the current record it appears Sung has not exhausted a claim based solely on disability discrimination, rending such a claim unreviewable here. To that extent, Sung is unlikely to succeed on the merits of such a claim.

Because Sung has not demonstrated that he is likely to succeed on the merits of any of his claims, he necessarily cannot obtain a preliminary injunction. *Winter* requires all four elements (likelihood of success, likelihood of irreparable harm, a favorable balance of equities, and demonstrating that an injunction is in the public interest). *Winter*, 129 S. Ct. at 374. Nevertheless, the court briefly addresses all the elements and concludes that Sung has not demonstrated that he meets any of the factors necessary for imposition of a preliminary injunction.

## B.     Irreparable Harm

To obtain a preliminary injunction, Sung would also have to demonstrate that irreparable harm is not only "possible" but "likely." *Winter*, 129 S. Ct. at 376. The harm must be "actual and imminent, not conjectural or hypothetical[.]" *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S. Ct. 1142,

1149 (2009).

Sung seeks to prevent the Army from reporting his termination from his residency to "state licensing boards, hospital credentialing committees, the National Practitioner[] Data Bank [("NPDB")], and/or the Healthcare Integrity and Protection Data Bank [("HIPDB").]"  Doc. No. 9 ¶ 46.  In response, the Army represents that his termination "will not be reported as an 'adverse action' and does not require reporting to the NPDB or state licensing agencies."  Doc. No. 23-1, at 30.  Sung was not a credentialed physician and had no clinical privileges.  He was not charged with willful misconduct or found to have been grossly negligent  -- either of which would be reportable.  And so his termination, according to the Army, is not reportable to the NPDB or to the HIPDB.  *See* Doc. No. 23-16, at 4-5.

Sung nevertheless indicated at the hearing that the Army might still seek to report his termination to relevant boards or committees.  Such a possibility, however, does not amount to a likelihood of irreparable injury -- especially where the court has found that Sung is not likely to succeed on the merits of his initial claims.  He has not established the second *Winter* requirement.  For this additional reason, Sung's Motion for Preliminary Injunction fails.

///

///

**C.     Other Elements -- Balance of Equities and Public Interest**

Because Sung has failed to establish either a likelihood of success on the merits or that he faces a likelihood of irreparable harm, it necessarily follows that the balance of equities does not tip in his favor.

The Army had valid reasons for terminating Sung from his residency -- it has a responsibility to certify surgeons who are capable of working independently and consistently in unpredictable situations. The judgment of military doctors was that he was not competent to be an independent surgeon. That concern, balanced against a low likelihood of success on Sung's claim that the termination decision violated Sung's constitutional rights, tips the equities against Sung.

Similarly, given the findings on the first two prongs of the *Winter* analysis, Sung cannot demonstrate that an injunction "confirming the ineffectuality of his termination" would be in the public interest. Given a low likelihood of success on Sung's constitutional claim, the public has little if any interest in allowing him to continue his surgical residency.

///

///

///

# V. **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Preliminary

Injunction, Doc. No. 17, is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, June 30, 2011.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Sung v. Gallagher*, Civ. No. 11-00103 JMS/KSC, Order Denying Plaintiff's Motion for
Preliminary Injunction